IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BREANNA WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-633-RP |
| | § | |
| OFFICER NATHAN CANCHE and | § | |
| OFFICER VANESSA JIMENEZ, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court is Defendants Nathan Canche ("Canche") and Vanessa Jimenez's ("Jimenez," together "Defendants") motion for summary judgment. (Dkt. 40). Having considered the parties' submissions, the record, and the applicable law, the Court issues the following order.

**I. BACKGROUND**

This case concerns alleged excessive force by Austin Police Officers Canche and Jimenez against Plaintiff Breanna Williams ("Williams"). In the early morning of June 26, 2017, Williams went with a friend to the Four Seasons Hotel in Austin, Texas after they had been drinking. (Williams Depo., Dkt. 40-1, at 26, 31, 39). While in the hotel lobby and bathroom, Williams and her friend became involved in a verbal dispute with hotel management. (*Id.* at 36–42).

During the altercation, Williams states that she "put her hands on the back of [the hotel employee's] head," in a way that "brushed [her] hand on the back of [the manager's] head." (*Id.* at 43). "Immediately after," the manager called hotel security, stating that Williams had punched her. (*Id.* at 44). When the security guard arrived, Williams states that she also "brushed up against the back of his head." (*Id.* at 46). Williams states that the security guard then threw Williams on the ground and held her face down. (*Id.* at 47). Hotel staff called the police. (Internal Affairs Report,

1

Dkt. 40-2, at 8). Canche recalls being told that Williams had pushed the hotel employee against a wall and slapped her and had hit the security guard in the back of the head. (*Id.*).

According to hotel video and cellphone video taken by Williams' friend, when Canche and Jimenez arrived at the hotel shortly after, the hotel security guard was still holding Williams down on the floor of the hotel lobby. (Pl.'s Video, Dkt. 42-4, at 00:26–00:50). Canche testified that Williams was "struggling with the security guard," and "kicking and screaming," and "at the time it looked like she was attacking the security guard," and "she was trying to hit him." (*Id.*) (juxtaposing Canche's deposition with video of the incident). However, video of the hotel lobby shows that Williams was being held on the ground and was not moving when the officers arrived. (*Id.*).

Canche and Jimenez then began to handcuff Williams and place her under arrest for public intoxication. (*Id.* at 00:52–1:50; Internal Affair Report, Dkt. 40-2, at 9). Initially, video of the hotel lobby shows that Williams was laying on her left side with her left arm pinned behind her, and was not moving except when she attempted to lift her head and shoulders off the ground and was pushed down by a police officer. (Pl.'s Video, Dkt. 42-4, at 00:50–1:02). While Canche and Jimenez attempted to handcuff her, Williams grabbed her hands behind her, stiffened her arms, pulled her right hand away, and said "No." (*Id.* at 00:50–1:50). After two other police officers assisted in putting Williams into an "arm lock" and handcuffing her, she was pulled to her feet and walked outside of the hotel to one of the parked police cars. (*Id.* at 1:45–2:15).

The officers then searched Williams outside of the police car, during which both the officers and Williams were speaking relatively calmly. (Police Car #1, Dkt. 40-5, at 2:57:00 AM–2:57:55 AM). Williams became agitated when Canche started to pull bobby pins out of Williams' hair, moving her head away and telling Canche to "stop." (*Id.* at 2:57:55 AM–2:58:02 AM). Jimenez then held Williams face down on the hood of the car while Canche took the bobby pins out of her hair, and Williams was crying and saying, "you're going to hurt me, you're going to leave bruises." (*Id.* at

2

2:58:02 AM–2:58:16 AM). Jimenez and Canche continued to tell Williams that she was under arrest, while Williams did not move other than turning her head to the other side; during this, Williams argued with Canche about whether bobby pins could be considered weapons. (*Id.* at 2:58:16 AM–2:59:05 AM; Outside Hotel Video, Dkt. 40-4, at 2:06–2:20). A third police officer stood nearby, shining a flashlight in Williams' hair. (*E.g.*, Police Car #1, Dkt. 40-5, at 2:58:39 AM–2:58:50 AM).

Jimenez and Canche then stood Williams up and walked her to the side of the police car, during which Williams dragged her feet, while the third officer opened the passenger door. (*Id.* at 2:59:03 AM–2:59:10 AM; Outside Hotel Video, Dkt. 40-4, at 2:20–2:33). Canche later observed that, "when [he] walked her to the vehicle, it wasn't a problem." (Internal Affairs Report, Dkt. 40-2, at 11).

As soon as the door was open, Canche and Jimenez began to try to put Williams inside the car, with one officer holding each of her handcuffed arms. (Outside Hotel Video, Dkt. 40-4, at 2:33–2:35). For no more than five seconds, Williams reacted by refusing to enter the car, trying to lean her body back, digging her heels into the ground, and bending her legs at the knees. (*Id.* at 2:34–2:38); (Police Car #2, Dkt. 40-6, at 2:59:20 AM–2:59:23 AM). The video indicates that Canche and Jimenez had control of Williams during these five seconds, holding onto each side of her. (Outside Hotel Video, Dkt. 40-4, at 2:33–2:38).[1]

Based on video footage from outside the car during those five seconds, Williams was facing the car handcuffed, the officers forced her into a position where she was standing with her torso

---

[1] In contrast, Canche stated, during a subsequent internal affairs investigation, that Williams' actions were causing him and Jimenez to lose their balance, and lose control of her. (Internal Affairs Report, Dkt. 40-2, at 33). However, this is not supported by the hotel video, where Canche and Jimenez each appear to have control of Williams, each holding her by her arm. (Outside Hotel Video, Dkt. 40-4, at 2:33–2:38). Similarly, in the corner of the video from inside the police car, Canche's feet can be seen firmly planted on the ground in the seconds leading up to Williams entering the police car. (Front of Car #1, Dkt. 40-5, at 2:59:20 to 2:59:28). The Court considers this to be, at most, a material fact issue. Considering the evidence in the light most favorable to the nonmovant, the Court considers Canche and Jimenez to have had control of Williams as they tried to get her to enter the police car.

3

bent over at the waist, before she was then face down in the back of the car. (Outside Hotel Video, Dkt. 40-4, at 2:36–38). The video from the inside of the car's backseat shows both of Canche's hands on the top half of Williams' back as she entered the backseat head-first. (Police Car #1, Dkt. 40-5, at 2:59:23 AM–2:59:27 AM).

Although it is unclear from the videos what amount of force was exerted by Canche on Williams' back, the video inside the car of Canche's hands on Williams' upper back indicates that her injuries were sustained from being pushed into the backseat of the car. (*Id.*). Although Defendants argue that the ground was wet and "as Canche pushed on Williams' torso, Williams lost her balance and fell onto the backseat," there is no part of the videos that visibly indicates that Williams slipped, whereas Canche's hands can be seen pushing Williams's back as she entered the car facedown. (*Id.*; Mot. Summ. J., Dkt. 40, at 3 (citing Internal Affairs Report, Dkt. 40-2, at 13)). Afterwards, Canche stated that because Williams' "handcuffs were behind the back . . . her balance was not very good," and "she couldn't break her fall." (Internal Affairs Report, Dkt. 40-2, at 13). Williams struck her head on the backseat's seatbelt buckle, which included an exposed metal bolt, resulting in a bloody laceration on the side of her face. (Mot. Summ. J., Dkt. 40, at 3; Injury Photos, Dkt. 42-2; Seatbelt Photo, Dkt. 40-3, at 3; Internal Affairs Report, Dkt. 40-2, (Canche stating that it was "a huge bolt")). Williams' injury caused major scarring and nerve damage, permanently affecting her appearance, and resulting in intermittent migraines. (Willliams Decl., Dkt. 42-1, at 2).

Williams brings a claim pursuant to 42 U.S.C. § 1983 for excessive force under the Fourth Amendment, asserting that Canche and Jimenez used excessive force by "[t]hrowing Ms. Williams' face into a seatbelt receiver." (Am. Comp., Dkt. 3, at 3). Defendants seeks summary judgment on the excessive force claims against Canche and Jimenez. (Dkt. 40).

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a

genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

Defendants assert that they are entitled to qualified immunity. Whether an official is entitled to qualified immunity is a two-step inquiry. In the context of a motion for summary judgment, the Court must determine (1) whether the plaintiff has shown a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court has discretion to decide which of the two steps to address first. *Id.* at 236. When a defendant requests summary judgment based on qualified immunity, the defendant "must be prepared to concede the best view of the facts to the plaintiff." *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzales v. Dall. Cnty.*, 249 F.3d 406, 411 (5th Cir. 2001)).

A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* Even when considering a qualified immunity defense, however, the court must view the evidence in the light most favorable to the nonmovant and draw all inferences in the nonmoving party's favor. *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993). It may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### A. Excessive Force by Jimenez

Defendants argue that Jimenez is entitled to summary judgment because she did not injure Williams, as the only force Jimenez exerted on Williams was holding her shoulder and arm. (Mot. Summ. J., Dkt. 40, at 5); (Williams Dep., Dkt. 40-1, at 67–68) ("Q: Did Officer Jimenez push you or

6

use any force on you . . . A: No."). Williams does not make any arguments regarding Jimenez. (*See generally* Resp., Dkt. 42; *see also* Reply, Dkt. 43, at 2). Because Williams has not alleged that she was injured by Jimenez, the Court grants summary judgment in favor of Jimenez. *See Flores v. City of Palacios*, 381 F.3d 391, 397 (5th Cir. 2004) ("A plaintiff alleging an excessive force violation must show that she has suffered 'at least some injury.'").

### B. Excessive Force by Canche

The Court next considers whether Canche violated Williams' constitutional "right to be free from excessive force during a seizure" under the Fourth Amendment. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). Whether a use of force is unconstitutionally excessive depends on the context in which the force was used. *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999). "To gauge the objective reasonableness of the force used by the law enforcement officer," the Court "must balance the amount of force used against the need for force." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Flores v.*, 381 F.3d at 399).

The Fifth Circuit has emphasized that determining "the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 411 (5th Cir. 2009). "When facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably," a court "can hold that an officer acted reasonably as a matter of law." *Id.* at 412. However, "when facts are disputed and significant factual gaps remain that require the court to draw several plaintiff-favorable inferences," a court "must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff." *Id.* If a rational factfinder could conclude that Canche violated the Constitution, the Court must move on to the qualified immunity question. *See id.*

To prove an excessive force claim, Williams must show that "in addition to being seized, [s]he suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive

to the need and that (3) the force used was objectively unreasonable." *Peterson v. City of Fort Worth*, 588 F.3d 838, 846 (5th Cir. 2009) (citation and quotation marks omitted). The first element turns on the second and third, *Sam v. Richard*, 887 F.3d 710, 714 (5th Cir. 2018), which are typically analyzed together according to the factors enunciated in *Graham v. Connor*, 490 U.S. 386 (1989). *See Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir. 2017) (analyzing the second and third factors together).

To establish the first element of an excessive force claim, a plaintiff must prove more than a de minimis injury. *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). "Any force found to be objectively unreasonable necessarily exceeds the de minimis threshold, and, conversely, objectively reasonable force will result in de minimis injuries only." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (citation and quotation marks omitted). Stated differently, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Id.* Williams has produced evidence of an injury, a laceration on the side of her face resulting from being pushed into the police car. (Mot. Summ. J., Dkt. 40, at 3; Dkt. 42-2, at 2). The question, then, is whether Canche's use of force was clearly excessive and objectively unreasonable.

"Excessive force claims are necessarily fact-intensive; whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (cleaned up). In reviewing the facts and circumstances of a case, the court should consider "the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 728–29 (quoting *Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). "[O]fficers must assess not only the need for force, but also the

8

relationship between the need and the amount of force used." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citation and internal quotation marks omitted). "[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) (citing *Deville*, 567 F.3d at 167). For the reasons discussed below, the Court finds that, viewing the facts in the light most favorable to Williams, a reasonable jury could find that Canche's use of force in pushing Williams into the police car was excessive and objectively unreasonable.

Analyzing the first *Graham* factor, the severity of the crime at issue, Williams was under arrest for public intoxication. (Internal Affair Report, Dkt. 40-2, at 9). Public intoxication is a "Class C misdemeanor . . . a minor offense militating against the use of force." *Cuellar v. Duboise*, No. AU-17-CA-00223-SS, 2018 WL 4955218, at *4 (W.D. Tex. Oct. 11, 2018) (citing *Trammel v. Fruge*, 868 F.3d at 340). This factor weighs in favor of Williams.

Under two of the other *Graham* factors, there are no allegations that Williams, who was handcuffed, posed any threat to others or was attempting to flee. (*See generally* Mot. Summ. J., Dkt 40; Internal Affairs Report, Dkt. 40-2, at 13 (Canche stating that he "didn't feel like [Williams] was a threat to [him]")). Thus, these two factors weigh in favor of Williams.

Regarding the remaining *Graham* factor, video shows that Williams resisted entering the police car. (Outside Hotel Video, Dkt. 40-4, at 2:34–2:38); (Police Car #2, Dkt. 40-6, at 2:59:20 AM–2:59:23 AM). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. In general, officers may use "measured and ascending actions that correspond[] to . . . escalating verbal and physical resistance." *See Poole*, 691 F.3d at 629 (5th Cir. 2012).

Defendants argue that Canche's use of force was objectively reasonable given the totality of the circumstances of Williams' non-compliance during handcuffing and entering the police car.

9

(Mot. Summ. J., Dkt. 40, at 6) (citing *Deville v. Marcantel*, 567 F.3d at 167) ("Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance."). However, the Court notes that Williams' only resistance during handcuffing was to stiffen and move her arms, while two to four police officers held her on the ground. (Pl.'s Video, Dkt. 42-4, at 00:50–1:50). The Fifth Circuit has previously held that it was "objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Trammell*, 868 F.3d at 343. In any event, after being handcuffed, Williams had become more subdued while being searched at the front of the police car, before the officers attempted to place her inside the car. (Police Car #1, Dkt. 40-5, at 2:57:00 AM–2:57:55 AM). Accordingly, the Court gives little weight to the consideration of Williams' earlier resistance to being handcuffed in evaluating the level of force used to get Williams to enter the police car. *See Lytle*, 560 F.3d at 413 ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."); *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) ("[T]he force calculus changes substantially once that resistance ends.").

As for Williams' resistance in entering the police car, Defendants argue that Canche used measured force in response to Williams "continually ignoring" the officer's instructions to get in the patrol car and resisting by stiffening her body and locking her knees. (Mot. Summ. J., Dkt. 40, at 6). However, "[t]he Fifth Circuit has stressed that a relevant consideration in determining whether an officer's force was excessive to the need is the 'speed with which an officer resorts to force.'" *Muslow v. City of Shreveport*, 491 F. Supp. 3d 172, 186 (W.D. La. 2020) (citing *Trammell*, 868 F.3d at 342). Williams had been resisting entering the open car door for, at most, five seconds before she was pushed face first into the back of the car. (Outside Hotel Video, Dkt. 40-4, at 2:33–2:38). In *Trammell*, the Fifth Circuit explained that a reasonable jury could infer that "officers used very little,

if any, negotiation before resorting to physical violence," where only three seconds had elapsed between an officer's request for the plaintiff to place his hands behind his back, and the officer tackling the plaintiff. *Trammell*, 868 F.3d at 342. Additionally, the need for Canche to use force against Williams was also mitigated by the fact that Williams was already handcuffed at the time. *See Peterson v. City of Fort Worth*, 588 F.3d 838, 843 (5th Cir. 2009).

Further, "Courts may also consider the 'extent of [the] injury inflicted' to determine whether an officer's force was justified, or if it instead 'evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur.'" *Callaway v. Travis Cnty.*, No. A-15-CA-00103-SS, 2016 WL 4371943, at *3 (W.D. Tex. July 28, 2016) (citing *Deville*, 567 F-3d at 168); *see also King v. Munoz*, No. A-16-CV-131-SS-ML, 2017 WL 8948610, at *4–5 (W.D. Tex. June 16, 2017), *report and recommendation adopted*, No. A-16-CA-131-SS, 2017 WL 4547170 (W.D. Tex. Oct. 12, 2017). As a result of being pushed into a seatbelt receiver, Williams has major scarring and nerve damage on her face, as well as intermittent migraines. (Williams Decl., Dkt. 42-1, at 2).

Given the short amount of time that passed between opening the car door and Canche pushing Williams, a reasonable jury could find that, in light of the amount of resistance from Williams, Canche used objectively unreasonable force. Specifically, because Williams was only shifting her weight to resist entering the car when Canche pushed on Williams' back so that she landed face first in a backseat where there were two seatbelt receivers attached to exposed metal bolts. Although Williams did not pose a threat and could not break her fall because her hands were handcuffed behind her back, Canche used enough force to cause a laceration on Williams' face with long term damage. (Police Car #1, Dkt. 40-5, at 2:59:23 AM–2:59:27 AM; Internal Affairs Report, Dkt. 40-2, at 13; Mot. Summ. J., Dkt. 40, at 3; Dkt. 42-2, at 2; Seatbelt, Dkt. 40-3, at 3).

### C. Canche's Qualified Immunity

Having found that a jury could reasonably conclude from this set of facts that Canche's use of force was a constitutional violation, the Court next evaluates whether Canche's use of force was objectively unreasonable under clearly established law. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "Clearly established" means that, at the time of the defendant's conduct, the law was "sufficiently clear" that a reasonable official would understand his action violated a federal constitutional right. *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2015) (internal quotation omitted). That the act complained of violates a constitutional right must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), which means it is dictated by "controlling authority" or "a robust consensus of cases of persuasive authority," *al–Kidd*, 563 U.S. at 741–42 (internal quotations omitted). When determining whether the right at issue was "clearly established," the Supreme Court has "stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the [constitutional right at issue] . . . While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate . . ." *District of Columbia v. Wesby*, 138 S. Ct., 577, 581 (2018) (internal quotation marks omitted).

Under Fifth Circuit precedent, "where an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell*, 868 F.3d at 341. However, "[i]t is unclear at what point passive resistance becomes the sort of active resistance which justifies force." *Id.* (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000)). Active resistance may warrant the use of force, but for such force to be reasonable it must involve "'measured and ascending' actions that corresponded to [plaintiff's] escalating verbal and physical resistance." *Poole*, 691 F.3d at 629; *see also Chacon v. Copeland*, 577 F. App'x 355, 362 (5th Cir. 2014) ("Even if some action by [plaintiff] demonstrated resistance, the fact question found by the district court remains: whether, even when considering his possible resistance, shoving Chacon to the ground while he attempted to

12

explain himself, punching him in the head while he was on the ground, or shooting him with a Taser, constituted excessive force."); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332–33 (5th Cir. 2020) ("The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive. While 'a suspect's refusal to comply with instructions' may indicate that physical force is justified, officers must also select the appropriate 'degree of force.'"). "[T]he central concept of this analysis is fair warning, which means that a reasonable official would understand the conduct in this case violated the Fourth Amendment." *Chacon*, 577 Fed. Appx. at 363 (cleaned up).

The video evidence shows that Williams' actions would likely be considered active resistance, although a reasonable jury could still find it to be minimal resistance. (*See* Outside Hotel Video, Dkt. 40-4, at 2:33–2:38; Police Car #2, Dkt. 40-6, at 2:59:20 AM–2:59:23 AM). The question is thus whether Canche's force, when he pushed Williams face first into the seatbelt receiver while she was handcuffed, was a "measured and ascending" action in response to Williams' amount of resistance according to Fifth Circuit precedent.

Defendants first cite to cases where officers used force against a plaintiff who was resisting being handcuffed. (Mot. Summ. J., Dkt. 40, at 8–9) (citing *Collier v. Montgomery*, 569 F.3d 214 (5th Cir. 2009) (holding there was no constitutional violation when plaintiff resisted being handcuffed and "grappled" with the police officer before the police officer pushed the plaintiff onto the hood of the police car and forced his right arm behind his back); *Max-George v. Hous. Police Dept.*, 2020 WL 6322283 (S.D. Tex., October 28, 2020) (plaintiff resisted being handcuffed while in his car by knocking an officer's hand away, grabbing the officer by the vest, and engaging in a struggle with five police officers where two officers were injured). However, these cases are inapplicable because Williams was already handcuffed and did not pose a threat. (Internal Affairs Report, Dkt. 40-2, at 13).

Defendants also cite to *Delpit v. Baton Rouge City Police Dist. 2*, 2018 WL 3076726 at *8–9 (M.D. La., June 21, 2018), where an already handcuffed plaintiff resisted entering a police car by pulling away from officers, and "by pushing back and/or standing still in front of the driver-side back door." *Id.* at 1, 3. Although this is similar to Williams' resistance in entering the police car, the court in *Delpit* granted qualified immunity specifically in light of "a small, agitated crowd of neighbors [that] began to gather in close proximity to the officers as [the plaintiff] was being escorted to the police vehicle, adding another safety concern," and the fact that the plaintiff's mother had "repeatedly interfere[ed] with [the] arrest." *Id.* at 8, 9. In this case, there were no similar factors that indicated a risk of escalating danger. Although Williams was resisting entering the car, she was outnumbered at least three to one, there were no weapons present (besides the bobby pins that Canche had removed from her hair), and her friend was not interfering. (Police Car #1, Dkt. 40-5, at 2:58:00AM– 2:59:10AM; Outside Hotel Video, Dkt. 40-4, at 2:25–2:40).

A more analogous case is *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009). There, the plaintiff, who had been drinking, was already handcuffed when a police officer "delivered a hard knee strike to [his] thigh." *Id.* at 843. While plaintiff disputed to what extent he was resisting at the time, the defendant city argued that the plaintiff was "belligerent and the knee strike was necessary to restrain him," while the police officer testified that the plaintiff, "still continued to fail to comply. He wouldn't stand still. He was pulling away from us . . . He [took] an aggressive stance toward us and [did] not [comply] to what we're asking him to do." *Id.* at 846–47. Even considering this evidence of resistance, it was still disputed "whether continuing force in the form of a knee strike was justifiable after [the plaintiff] had been handcuffed." *Id.* at 847. Just like in *Peterson*, Canche used force on Williams, who was resisting, *after* she had been handcuffed. The Fifth Circuit has subsequently described *Peterson* as "narrow," and "clearly establish[ing] that a knee strike is excessive after the suspect is handcuffed and under control." *Defrates v. Podany*, 789 F. App'x 427, 434 (5th Cir.

14

2019). The Court finds that the case at hand fits this narrow situation, as Williams was handcuffed and under the control of two police officers who were holding on to her, with two other officers on the scene at the time. As such, it was clearly established in light of *Peterson* that it was objectively unreasonable to knee strike someone who was in handcuffs and under control, even if they were "minimally" resisting. *Peterson*, 588 F.3d at 843 n.1, 847 ("[The officer] testified that [the plaintiff] resisted, but only minimally."). This would have put Canche on notice that pushing Williams face first into a seatbelt receiver when she was already handcuffed and briefly resisted entering a car, would have been unreasonable.

As such, examining the evidence in the light most favorable to the nonmovant, the Court finds that it was clearly established that Canche's use of force was objectively unreasonable. Canche is therefore not entitled to qualified immunity, and the Court denies his motion for summary judgment.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendants' Motion for Summary Judgment, (Dkt. 40), is **GRANTED IN PART and DENIED IN PART.** The Court **GRANTS** summary judgment in favor of Jimenez. The motion is **DENIED** in all other respects.

**SIGNED** on July 20, 2021.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE